# UNITED STATES DISTRICT COURT

for the
Eastern District of Wisconsin

In the Matter of the Search of:

a black LG smartphone, model LM-X210MA (bearing serial no. 802CYLH140888)

)
)
)
)
)
)

Case No. ___18-M-147 (DEJ)___

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property:

See Attachment A

located in the Eastern District of Wisconsin, there is now concealed:

See Attachment B

The basis for the search under Fed. R. Crim P. 41(c) is:

☒ evidence of a crime;
☐ contraband, fruits of crime, or other items illegally possessed;
☐ property designed for use, intended for use, or used in committing a crime;
☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to violations of: Title 18, United State Code, Section, 922(g), and
Title 21, United States Code, Sections 841(a)(1) and 846

The application is based on these facts: See attached affidavit.

☐ Delayed notice of _____ days (give exact ending date if more than 30 days:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
Applicant's signature

Special Agent Richard Connors III, ATF
Printed Name and Title

Sworn to before me and signed in my presence:

Date: ___Aug. 24, 2018___

_____
Judge's signature

City and State: __Milwaukee, Wisconsin__

Honorable David E. Jones, U.S. Magistrate Judge
Printed Name and Title

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, **Richard Connors**, being first duly sworn, hereby depose and state as follows:

### AGENT BACKGROUND AND INFORMATION

1.    I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of property—electronic devices—which are currently in law enforcement possession, and the extraction from that property of electronically stored information described in Attachment B.

2.    I am employed as a Special Agent with the United States Department of Justice, Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") assigned to the Milwaukee Field Office since October of 2015. I have been employed as a full time law enforcement officer for approximately two years and six months. I have received training at the Federal Law Enforcement Training Center in Glynco, GA. I attended the Criminal Investigator Training Program, as well as ATF's Special Agent Training Program. I have received training in the investigation of unlawful possession of firearms, the unlawful transfer of firearms, and the unlawful dealing in firearms without a dealers' license. Prior to becoming a Special Agent with the ATF, I received two (2) bachelor's degrees from Northern Illinois University in the fields of Sociology and International Relations. I have received a Master's degree from Northern Illinois University in the field of American Government.

1

3.  I have received training in the investigation of firearm and drug trafficking. Based on my training, experience, and participation in firearm trafficking investigations, I know and/or have observed the following:

a.  I have utilized informants to investigate firearm and drug trafficking. Through informant interviews and debriefings of individuals involved in those offenses, I have learned about the manner in which individuals and organizations distribute these items in Wisconsin and elsewhere;

b.  I have also relied on informants to obtain firearms (as opposed to licensed gun dealers) and controlled substances from individuals on the streets, known as a controlled purchase;

c.  I have experience conducting street surveillance of individuals engaged in firearm and drug trafficking. I have participated in the execution of numerous search warrants where drugs, firearms, ammunition, and magazines have been seized;

d.  I am familiar with the language utilized over the telephone to discuss firearm and drug trafficking, and know that the language is often limited, guarded, and coded;

e.  I know that firearm and drug traffickers often use electronic equipment to conduct these operations;

f.  I know that drug traffickers commonly have in their possession, and at their residences and other locations where they exercise dominion and control, firearms, ammunition, and records or receipts pertaining to such;

g.  I know that firearm and drug traffickers often put their telephones in nominee names to distance themselves from telephones that are utilized to facilitate these and related offenses; and

h.  I know that firearm and drug traffickers often use proceeds to purchase assets such as vehicles, property, jewelry, and narcotics. I also know that firearm and drug traffickers often use nominees to purchase and/or title these assets to avoid scrutiny from law enforcement officials I also know what firearm

2

and drug traffickers may keep photographs of these items on electronic devices.

4.        I have participated in multiple firearm and drug trafficking investigations that involved the seizure of computers, cellular phones, cameras, and other digital storage devices, and the subsequent analysis of electronic data stored within these computers, cellular phones, cameras, and other digital storage devices.  In many occasions, this electronic data has provided evidence of the crimes being investigated and corroborated information already known or suspected by law enforcement.

5.        This affidavit is based upon my personal knowledge and upon information reported to me by other federal and local law enforcement officers during the course of their official duties, all of whom I believe to be truthful and reliable.

6.        Because this affidavit is submitted for the limited purpose of securing a search warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only facts that I believe are sufficient to establish probable cause of violations of Title 18, United State Code, Section, 922(g) (felon in possession of a firearm and user in possession of a firearm), and Title 21, United States Code, Sections 841(a)(1) (knowingly and intentionally possessing with the intent to deliver a controlled substance, heroin and cocaine) and 846 (conspiracy to distribute a controlled substance).

## I.        IDENTIFICATION OF THE DEVICES TO BE EXAMINED

7.        I am submitting this affidavit in support of a search warrant for a Black Samsung flip style phone, model SM-B311V (bearing serial no. A0000047714309),

3

hereinafter referred to as "Device A." Device A is currently in Milwaukee Police Department custody under inventory number 18030878, item number 1 and is currently located at the Milwaukee Police Department's Property Control Division at 2620 W. Wisconsin Ave, Milwaukee, WI.

8. I am also submitting this affidavit in support of a search warrant for a black LG smartphone, model LM-X210MA (bearing serial no. 802CYLH140888), hereinafter referred to as "Device B." Device B is currently in Milwaukee Police Department custody under inventory number 18030878, item number 2 and is currently located at the Milwaukee Police Department's Property Control Division at 2620 W. Wisconsin Ave, Milwaukee, WI.

9. The applied-for warrant would authorize the forensic examination of Device A and Device B for the purpose of identifying electronically stored data more particularly described in Attachment B.

## II. PROBABLE CAUSE

10. In Eastern District of Wisconsin federal case 2006-CR-278 numerous individuals were indicted stemming from an investigation into the 1st and Keefe Vice Lords (VL) street gang operating near the area of 1st Street and Keefe Avenue, Milwaukee, Wisconsin. Numerous subjects provided statements to the government regarding the activities of the VL prior to 2006. Those statements are from sources of information 1-8.

4

11.     In February of 2007, a subject herein referred to as source of information-1 (SOI-1), provided a statement to law enforcement pursuant to a proffer agreement. In this statement, SOI-1 stated he/she moved to Milwaukee from Chicago. SOI-1 stated he/she was living in the area of 1st/Keefe. SOI-1 stated in 1991-1992, he/she was getting cocaine from his/her cousin who stated the cocaine was sourced from Chicago. The SOI-1 stated eventually he/she and others from the 1st/Keefe area were selling cocaine out of SOI-1's mother's house. The SOI-1 stated once his/her cousin was no longer supplying him with cocaine, he/she and the others on Keefe began getting their cocaine directly from another source in Chicago. SOI-1 stated he/she continued to sell cocaine in the 1st/Keefe area until they went to jail in 1999.

12.     SOI-1 stated he/she returned to selling cocaine in the Milwaukee area after release from prison. In 2004 SOI-1 stated they went to Chicago with Jonathan MORSE (b/m, DOB 06/15/1981, aka Lil Jon) on two (2) occasions, to pick up cocaine. SOI-1 stated MORSE was picking up cocaine from MORSE's cousin, Lamont CLAYBORN (b/m, DOB 12/18/1966). SOI-1 stated Jonathan MORSE and Preston MORSE (b/m, DOB 11/23/1978, aka P) were splitting the cost for the cocaine. SOI-1 stated they were purchasing cocaine for approximately $20,000 to $21,000 per kilo. SOI-1 explained the first time he/she went with Jonathan MORSE to Chicago, they did not see the quantity of cocaine MORSE purchased. On the second trip to Chicago, SOI-1 stated Jonathan MORSE bought three (3) kilos of cocaine. SOI-1 further explained Jonathan MORSE put

5

the cocaine into a backpack, drove the product back to his house on 33rd and North in Milwaukee, then cooked the cocaine into crack for distribution. SOI-1 also stated during this time, the VL group would sell cocaine out of The Ret Bar, located at 3400 N. Holton Street in Milwaukee.

13.     SOI-1 stated around the time they were working with Jonathan MORSE, a group called Solid Over Concrete (SC) was formed. This group was a subgroup of VL. This group was led by a subject identified as Gregory MORSE (b/m, DOB 11/18/1978, aka Greedy). Greedy was supplying cocaine to the SC's. Once Greedy went to prison, Preston MORSE and Jonathan MORSE took over leadership of the SC group. This included being responsible for supplying the cocaine and control of the proceeds generated from the sale of the cocaine.

14.     In March of 2007, a subject herein referred to as source of information-2 (SOI-2) provided a statement to law enforcement pursuant to a proffer agreement. In this statement, SOI-2 stated they became involved with the VL group at a young age. SOI-2 stated he/she began to sell cocaine for the group when they were seventeen (17) – eighteen (18) years old. SOI-2 stated they purchased cocaine from MORSE, and described the cocaine MORSE supplied as consistently good quality. SOI-2 further stated MORSE always had an available supply of cocaine. SOI-2 further stated he/she always purchased crack cocaine because he/she did not know how to cook the cocaine.

6

15.     SOI-2 stated he/she first met MORSE in the mid to late 90's, when he/she bought cocaine from MORSE. SOI-2 stated at that time MORSE stated he had both powder and crack cocaine for sale. SOI-2 stated he/she bought powder weekly, which MORSE would cook up at his apartment on 13th and Vine. SOI-2 stated he/she once saw approximately one and a half kilos of cocaine, which MORSE had on the counter in his kitchen. SOI-2 stated over time he/she was routinely purchasing up to nine (9) ounces of crack for $6,500.00 from MORSE. SOI-2 stated that MORSE owned approximately three (3) Lexus vehicles during his/her time dealing with him, and he/she observed at least four (4) handguns in MORSE's possession. SOI-2 stated he/she purchased cocaine from MORSE from approximately 2002-2004 until MORSE went to jail.

16.     In April of 2007, a subject herein referred to as a source of information-3 (SOI-3) provided a statement to law enforcement pursuant to a proffer agreement. In this statement, SOI-3 stated he/she purchased cocaine from Jonathan MORSE two to three (2-3) times per month in 2003-2004. SOI-3 further stated MORSE would sometimes front him/her cocaine. SOI-3 also identified Clifton PENN's (previously identified by investigators as a b/m, DOB 05/21/1979) girlfriend, a black female he/she knew as "Tessie" (previously identified by investigators as Kontessa M. BLAYLOCK, DOB 01/22/1982), as being involved in the sale of crack cocaine.

17.     In April of 2008, a subject herein referred to as a source of information-4 (SOI-4) provided a mirandized statement to law enforcement during a custodial interview. SOI-4 stated he/she was involved in selling drugs in 2005-2006. During that period, SOI-4 stated he/she cooked up crack cocaine with Clifton PENN on two (2) occasions at an apartment on Fiebrantz and Green Bay in Milwaukee. SOI-4 stated PENN would pay for his/her assistance in cooking the drugs. SOI-4 stated PENN had a cocaine source in Chicago, but did not know the identity of that person.

18.     In April of 2008, a subject herein referred to as a source of information-5 (SOI-5) provided a mirandized statement to law enforcement during a custodial interview. During the interview, SOI-5 was shown a series of photographs. In response to a picture of Jonathan MORSE, SOI-5 stated he/she knew him as "Baby Jon," and SOI-5 stated he "sells weight in cocaine." Your Affiant knows the term sells weight is used to describe a person who sells a large quantity of cocaine. In response to a picture of Clifton PENN, SOI-5 stated he/she knew him as "Lil Red," and SOI-5 stated PENN sells smaller quantities of cocaine.

19.     In June of 2008, a subject herein referred to as a source of information-6 (SOI-6) provided a statement pursuant to a proffer agreement. In this statement, SOI-6 stated they returned to selling cocaine out of their house, in 2006, because they were broke. SOI-6 stated they got their cocaine from "Red," the previously established nickname for Clifton PENN, who was living near 1st and Nash at the time.

8

20.     In October 2008, a subject herein referred to as a source of information-7 (SOI-7) provided a statement pursuant to a proffer agreement.  In this statement, SOI-7 stated they hung out in the Keefe area from 2001-2006.  SOI-7 stated in that time he/she was selling "15 sacks" or bags containing fifteen (15) rocks of crack cocaine for Preston MORSE and Jonathan MORSE.  SOI-7 further explained individuals by the names of David THOMAS, Jerry WILLIAMS, and Clifton PENN would sell crack cocaine for Jonathan MORSE.  SOI-7 stated Preston MORSE and Jonathan MORSE would get bricks, also referred to as kilograms, of cocaine, from a male known as "Lamont," who was previously identified by investigators as Lamont CLAYBORN (b/m, DOB 12/18/1966) in Chicago.  Jonathan MORSE would then cook the cocaine into crack.  SOI-7 stated Preston MORSE and Jonathan MORSE told him/her that CLAYBORN was the source of the drugs.

21.     In March of 2016, a subject herein referred to as source of information-8 (SOI-8) provided a statement pursuant to a proffer agreement, regarding the illegal drug activity of the 1st/Keefe VL.  SOI-8 identified themselves as a member of VL and stated they have been affiliated since 1998.  SOI-8 stated many VL members were involved in the distribution of heroin and cocaine.  SOI-8 stated "Red" (Clifton PENN) and "Durell," who was previously identified by investigators as Durell HORTON (b/m, DOB 04/22/1985) would ride around together every day selling drugs.  SOI-3 stated he/she began riding with HORTON in 2012, and he/she rode with him every day until January

9

2013. SOI-8 stated HORTON would carry approximately seven (7) grams of crack cocaine and five (5) grams of heroin at a time. SOI-8 explained HORTON carried small quantities of drugs in that manner of packaging in order to avoid being charged with possession with the intent to distribute, if he were to be arrested.

22.    SOI-8 stated PENN was the main cocaine and heroin distributor for VL. SOI-8 stated PENN obtained his cocaine and heroin from a member of the Eastside Mafioso or from a subject nicknamed "Cowboy." SOI-8 stated he/she had no personal knowledge of PENN traveling to Chicago to obtain drugs. SOI-8 stated PENN would sell cocaine and heroin from PENN's girlfriend's house. SOI-8 identified PENN's girlfriend as Kontessa BLAYLOCK (b/f, DOB 01/22/1982).

23.    SOI-8 stated "Jon," the nickname identified by investigators for Jonathan MORSE, is distributing cocaine and heroin at the same level as PENN. SOI-8 stated MORSE is typically at the bar at 5th and Keefe, which was previously identified by investigators as Fox's Nite Club (421 W. Keefe Ave.), and SOI-8 stated the bar is where all the VL members go throughout the day or night. SOI-8 stated he/she has observed MORSE sell as much as fifty (50) grams of heroin on two occasions in 2012.

24.    SOI-8 also stated VL had a house at 2nd and Randolph that was used for distribution, and the house had a recording studio inside. The address of the residence was previously identified by investigators as 134 W. Randolph Street, in Milwaukee, Wisconsin.

10

25.    In November 2017, a subject herein referred to as source of information-9 (SOI-9), provided a statement to law enforcement regarding the current and ongoing criminal activity of the 1st and Keefe VL. In this statement, SOI-9 stated they worked with VL, led by Jonathan MORSE. SOI-9 outlined the organizational structure, describing smaller cliques within the group. SOI-9 explained he/she was in charge of a small subgroup of people selling drugs for VL. SOI-9 further explained that "CHEESE," later identified as Simone DOWNER (b/m, DOB 12/12/1974) was also in charge of leading another small group of people in the sale of drugs for VL. SOI-9 explained that both groups fell under the leadership of "RED," which is the previously established nickname for Clifton PENN. SOI-9 explained PENN oversaw every smaller street level groups that sold for VL.

26.    SOI-9 explained MORSE owned and operated a bar, Fox's Nite Club located at 421 W. Keefe, Milwaukee, Wisconsin. SOI-9 stated MORSE used the bar to launder the organization's drug proceeds. SOI-9 explained MORSE would take in money as investments into the business. Additionally, MORSE would pay people from the neighborhood a cash advance for liquor for the bar, as a means to make the payment of funds appear legitimate. SOI-9 also stated to officers that that MORSE always has multiple firearms inside the bar.

27.    SOI-9 further explained MORSE controls the money of the organization, and he has a reputation in the community as someone who could get you set up on your

11

feet once released from prison. SOI-9 stated MORSE would front individuals a pistol and a quantity of drugs to sell, in order to help them get back up and running selling drugs.

28.     SOI-9 stated MORSE gets his supply of drugs directly from Chicago, stating MORSE re-ups his supply once a month. SOI-9 explained MORSE, unidentified females, and a person known as "MICK" or "MICKEY," later identified by investigators as Darwin HORTON (b/m, DOB 07/08/1983), traveled to Chicago to resupply. The trip usually occurs mid-month. SOI-9 explained MORSE typically drove in the rear car, watching over the product. The middle car carrying the drugs was driven by one of several unidentified females, and Darwin HORTON drove the lead vehicle. The role of the lead vehicle was to drive ahead to scout for law enforcement. SOI-9 further explained once MORSE resupplied, he would "chop the drugs up" in the bar and give them to RED for distribution. Your Affiant knows through training and experience the term "chop the drugs up" is often used to describe the process by which pure product is diluted with filler material to increase the quantity of drugs available for resale to increase profit.

29.     SOI-9 also identified Durell HORTON as an associate under MORSE. SOI-9 stated Durell HORTON drives an Infiniti SUV.

30.     SOI-9 provided the address of a residence where VL store large quantities of drugs, the aforementioned residence at 134 W. Randolph Street, Milwaukee, WI. SOI-

12

9 explained the residence is used to store firearms (assault rifles and pistols), and "cook up dope." Your Affiant knows from training and experience the term "cook up dope" is a reference to turn powdered cocaine into a solid form commonly known as crack cocaine. SOI-9 further explained PENN, MORSE, and others frequently visit the residence. SOI-9 explained only specific people are allowed into the house because firearms are stored in the residence. Your Affiant knows from training and experience, that it is common for those engaged in the dealing of drugs to possess firearms for protection. SOI-9 stated MORSE supplied "pounds" of marijuana, and he stashed drugs at the house when he did not want to keep it at the bar. SOI-9 also stated PENN would take possession of the drugs from MORSE and would take them to the house on Randolph or to his own house for storage. SOI-9 also stated PENN recently started driving the 2014 WHITE DODGE CHALLENGER, WISCONSIN LICENSE PLATE 652-ZSZ, VIN 2C3CDYAG5EH122565. It should be noted, a search of the Wisconsin Department of Motor Vehicles reveals that the 2014 WHITE DODGE CHALLENGER, WISCONSIN LICENSE PLATE 652-ZSZ, VIN 2C3CDYAG5EH122565 is registered to Clifton C. PENN at 3833 N. 22nd Street, Milwaukee, Wisconsin.

31.    On January 25, 2018, your Affiant and ATF Task Force Officer (TFO) Anthony Randazzo interviewed an ATF Confidential Informant 22226 (CI), about the VL group operating near the intersection of N. First Street and W. Keefe Avenue in Milwaukee, Wisconsin.

32.     The CI stated VL deal marijuana, cocaine, and heroin. CI explained he/she knew the main members of VL whom they identified as Jonathan MORSE, Clifton PENN, and a person known as "Durell," whom is identified as the aforementioned Durell HORTON.   CI explained HORTON is PENN's "right hand man" whom he trusts to assist in the distribution of drugs.

33.     CI stated MORSE owns and operates a bar on 5th Street, Milwaukee, which he/she frequents regularly, identified as Fox's Nite Club located at 421 W. Keefe Ave. CI last visited the bar approximately three (3) weeks before this interview.   CI explained MORSE runs the bar, but does not own the building.   CI stated there are approximately six (6) apartments located above the bar, and MORSE has control of at least three of these apartments.   CI explained MORSE has a cousin, Preston MORSE, who lives in Chicago and stated he is the source of the gang's drugs.   CI stated MORSE has had this source for years.

34.     CI further elaborated on PENN's involvement with the group.   CI stated PENN oversees the day-to-day activity regarding the group's drug sales, in order to preserve the appearance that MORSE is earning money legitimately.   CI stated PENN has told him/her in the past that the group buys heroin by the kilo.   CI articulated the group controls a house near the intersection of Second Street and Randolph Street in Milwaukee, which VL uses as a "stash house" for their drugs.   Investigators have previously identified the residence located at 134 W. Randolph Street as associated with

14

VL drug distribution. CI stated a male he/she knows as "Reggie" oversees the stash house. CI showed investigators Facebook photographs of the group, and CI pointed to a photograph of "Reggie." Your Affiant recognized "Reggie" as Rodney BUTLER (b/m, DOB 07/31/1986), who was previously identified by investigators.

35.     CI outlined several occasions where they were in the bar following the group's trip to Chicago to resupply their drugs. On the first occasion, which took place in approximately 2016, the CI walked inside the bar and they locked the door behind them. Once inside the bar, the CI observed the group "break down the dope" and repackage it for street sale. CI stated the group was carrying the drugs inside an Adidas backpack. On the second occasion, which took place approximately July of 2017, CI walked into the bar and observed drugs in plain sight. CI also observed PENN running around saying, "hide everything. Someone's about to get violated." Your Affiant knows through training and experience, a "violation" is a formal punishment imposed by the gang for a transgression or mistake.

36.     CI next described the method in which VL would drive to Chicago to resupply. CI stated the group routinely drives three (3) vehicles to Chicago. The first vehicle is a "scout" car, whose job is to drive ahead and look for police. The second vehicle transports the drugs or money, and CI stated this car is usually driven by a female. CI stated to investigators MORSE launders the group's drug proceeds through the bar, and he/she stated VL have been utilizing this method of using legitimate

15

businesses as a means to launder proceeds for several years. CI further explained PENN once stated VL would like to acquire a car wash to aid in the laundering of their proceeds.

37.    On November 21, 2017, TFO Randazzo checked with the Milwaukee Police Department's License Investigation Unit for the licensing information associated with the premises of 421 W. Keefe Avenue, Fox's Nite Club. It was discovered that Fox's Nite Club holds a Class B Tavern License with the City of Milwaukee. The owner and proprietor is listed as Daria L. MORSE (b/f, DOB 10/02/1961) of 2855 N 33rd St in Milwaukee. Daria Morse is the mother of Jonathan Morse.

38.    ATF TFO Randazzo also conducted a search of the City of Milwaukee online property records for 421 W. Keefe Avenue, belonging to Fox's Nite Club. According to online property records, Victor Benton and Jewel Currie of 5410 N 36th St. in Milwaukee own the building which is occupied by Fox's Nite Club.

39.    On December 03, 2017, ATF SA Sean Carlson conducted surveillance at 134 W. Randolph Avenue, Milwaukee, Wisconsin. At approximately 13:52 hours, SA Carlson observed a black male whom he recognized as Rodney BUTLER walk to the corner of W. Randolph and N. Second Street. A short time later, a white Uhaul branded truck pulled up and stopped near BUTLER. The driver began to converse with BUTLER through the driver's side window. A few minutes later, a white Dodge Challenger with red racing stripe, recognized to be the vehicle registered to PENN based on the

16

distinctiveness of the racing stripe, pulled alongside the Uhaul truck and parked. ATF SA Sean Carlson next observed the driver of the Uhaul truck, an unidentified black male, exit the vehicle and walk over to the passenger side door of the white Dodge Challenger. The unidentified male then opened the passenger door of Challenger and grabbed a black backpack from inside the vehicle. The unidentified male then walked back across the street to BUTLER and handed the backpack to him. Finally, the unidentified male returned to the Uhaul, and drove away southbound. The white Challenger immediately departed southbound as well.

40. On December 10, 2017, MPD PO Pelczynski conducted surveillance at 134 W. Randolph Avenue, Milwaukee, Wisconsin. At approximately 14:54 hours, MPD PO Pelczynski observed a 2008 red Lexus GS (WI license plate 374-YFM), pull up next to the house and park behind a white vehicle that was occupied by two (2) unidentified black males who exited the target house a few minutes prior. The Lexus GS sat for a few minutes before both cars drove away from the area. It should be noted, a search of the Wisconsin Department of Motor Vehicles reveals that the red Lexus GS is registered to Jonathan T. MORSE at 2855 N. 33rd Street, Milwaukee, Wisconsin.

41. On December 17, 2017, MPD officers conducted a traffic stop of a black Infiniti FX35 bearing Wisconsin registration plate 154-ZRG. The officers stopped the Infiniti at 1321 W. Atkinson Ave, Milwaukee, Wisconsin for an expired vehicle registration. Durell HORTON was the sole occupant of the Infiniti. During the traffic

17

stop, MPD Officer Brandt observed a black zip-lock bag on the front passenger seat in plain view. Officer Brandt asked HORTON what was inside the bag and HORTON responded, "weed."

42. MPD officers searched the Infiniti and the aforementioned zip-lock bag, which contained a green-plant like substance of suspected marijuana. In addition to the suspected marijuana, officers recovered from the vehicle a digital scale and two iPhone cell phones

43. HORTON was subsequently arrested for the suspected marijuana. During a search incident to HORTON's arrest, officers recovered a third iPhone cell phone.

44. I am aware the suspected marijuana was conveyed to MPD District 5 for testing. I am aware the suspected marijuana was tested by MPD Officer Fuerte utilizing the Narc II number 05 field test kit. The substance tested positive for the presence of THC and weighed approximately 12.51 grams.

45. For several reasons, case agents believe that SOIs 1-9 and Confidential Informant 22226 are reliable and credible. Your Affiant believes the information provided by SOI's 1-8 in the aforementioned proffers to be credible, because the statements were provided against their penal interests. Affiant is unaware as to exactly what consideration the proffered individuals may have received. The information from SOIs 1-8 is further corroborated by the information provided by SOI-9 and CI 22226. These two sources have provided information that MORSE and PENN are continuing to

18

engage in narcotics trafficking in a manner that is nearly identical to what was described in the statements by SOIs 1-8. In addition to describing the activities of MORSE and PENN, SOI-9 and CI 22226 identified Durell HORTON as an individual associated with MORSE and PENN's narcotics trafficking operation. SOI-9 has provided information to investigators without the expectation of consideration. Some of the information provided by SOI-9 would be considered against his penal interests. SOI-9 has convictions for firearm violations, felon in possession of a firearm, armed robbery, and possession with intent to deliver cocaine. CI-22226 has provided information to investigators in the past that has led to the arrest of individual who were wanted for crimes. CI 22226 has also provided information that has led to the issuance of at least ten (10) search warrants that led to the recovery of firearms and narcotics. CI 22226 is a paid informant. CI 22226 has prior convictions for possession of marijuana, recklessly endangering safety, and armed robbery.

46.     On August 16, 2018, Milwaukee Police Department responded to a shooting which occurred in front of 3341 N. Hubbard Street. Upon arrival on the scene, officers made contact with SIMONE DOWNER in the rear alley of 3341 N. Hubbard, and determined DOWNER sustained one (1) gunshot wound to the upper left portion of his chest. DOWNER was transported to Froedert Hospital, and he was accompanied in the ambulance by MPD officer Melissa Jacobs. Located on DOWNER's person was a black Samsung flip-style phone (model SM-B311V, serial no. A0000047714309) (DEVICE A), a

19

black LG smartphone (model LM-X210MA, serial no. 802CYLH14088) (DEVICE B), a black Digit Z branded digital scale, .78 grams of suspected marijuana, and approximately $871.00 in US currency. All items were placed into MPD inventory pursuant to this investigation.

47.     MPD Detective Anne Portnoy met DOWNER at the hospital and questioned him about this incident. DOWNER was considered by MPD to be a victim of this shooting, and was not in police custody at the time of this interview. DOWNER first stated to Detective Portnoy that he was walking to a nearby store to buy cigarettes when he was approached by three (3) Puerto Rican males and one (1) black male. DOWNER stated one subject approached him with a firearm and he "swatted" it away. Then another subject shot him in the chest.

48.     A little while later, DOWNER again stated to Det. Portnoy that he was walking to the store to get cigarettes when a white SUV pulled up. Three (3) suspects got out of the vehicle, and the front passenger approached him holding a firearm. DOWNER stated he attempted to grab the firearm, and swatted it away, when he was shot by another subject.

49.     Upon further questioning, guided by witness accounts of the event, DOWNER changed his statement to Det. Portnoy, and said he observed an argument shortly before the shooting between subjects he identified as "Jerry," and "Bricks off Buffum," and DOWNER broke it up. DOWNER stated to Det. Portnoy he was walking

20

to the store after purchasing some marijuana "around the corner." DOWNER stated he was carrying the large quantity of US currency because he was looking to buy a car. DOWNER further explained he was able to gain control of the firearm during the encounter, and attempted to shoot back at the suspects after he was shot, but the firearm failed to fire. DOWNER stated he did not remember where he threw the firearm, but acknowledged that his DNA would be on the firearm. DOWNER maintained his DNA would not be present on the ammunition located inside the firearm.

50.     Following his treatment and release from the hospital, DOWNER was taken into MPD custody and transported to their central booking for questioning.

51.     On August 16, 2018 at approximately 10:00 pm, during a custodial interview, DOWNER admitted to MPD Det. Joshua Nemeth that he lied to the initial detective (Det. Portnoy). DOWNER stated he was afraid he was going to get into trouble for possession of the firearm. DOWNER identified a subject named Jarrod G. LOGAN (b/m, DOB 04/22/1991) as being on scene just prior to the shooting. DOWNER stated LOGAN was in an argument with an unknown subject, and he asked DOWNER to retrieve a firearm. DOWNER told LOGAN he would not, and LOGAN became upset with him, and left the area. Shortly after this encounter, a white Honda SUV pulled up and three (3) unknown suspects exited the vehicle. DOWNER stated the first suspect was armed with a revolver and he was able to take the firearm away from the suspect. DOWNER stated at this point the second suspect, armed with a black semi-automatic

handgun, shot him in the chest. DOWNER stated he attempted to return fire, but the firearm would not work, and he fled to where officers found him. DOWNER explained he hid the revolver after he fled, so that he could return later and retrieve the firearm. DOWNER also admitted to Det. Nemeth he possessed the "sack" of marijuana and a scale. DOWNER stated the scale was to verify the quantity of marijuana he was purchasing. Finally, DOWNER clarified the US currency in his possession was to be used to pay his mother's rent bill.

52.     Additionally, your affiant is aware that the August 16, 2018 shooting of DOWNER, has several characteristics indicative of subject being involved in the purchase or sale of narcotics. Your affiant is aware, through training and experience, that it is common for those engaged in business of selling drugs to possess firearms for their protection during the execution of the transaction. Furthermore, it is common for these individuals to possess digital scales to weigh the product, and possess large quantities of US currency on their person. Finally, your affiant is aware that drug transactions, whether one is buying or selling, are often communicated and facilitated utilizing cellular phones.

53.     Simone Downer is a convicted felon for a 2008 federal violation of distributing a controlled substance in violation of 21 U.S.C. §§ 841(b)(1)(A) and 846.

54.     Your affiant is aware the data contained within cellphones is valuable to law enforcement even at a later date. Cellphone forensic data can contain messages that

22

show a link between individuals which would be beneficial for a law enforcement investigation into drug trafficking. Previous contacts for associated members of the Vice Lords would prove vital for historically linking members of the group together. Your affiant has received information from confidential sources that DOWNER is still engaged in drug dealing activity as a 1st and Keefe Vice Lord. Furthermore, DOWNER appears to have been illegally in possession of a firearm. The data from DOWNER's Device A and B could lead law enforcement to develop violations of 18 U.S.C. § 922(g) and 21 U.S.C. §§ 841 and 846. Furthermore, the data from DOWNER's Device A and B could provide information regarding narcotics and firearm suppliers for the 1st and Keefe Vice Lords, associates of the VL, and assist in identifying drug house locations.

## III.     TECHNICAL TERMS

55.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates,

23

appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS

24

antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e. PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

56. Based on my training, experience, and research, I know that Devices have the capabilities that allow them to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and PDA and all have the ability to access the internet. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the devices.

25

## IV.   ELECTRONIC STORAGE AND FORENSIC ANALYSIS

57.     Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the devices.  This information can sometimes be recovered with forensics tools.

58.     *Forensic evidence.*  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

   a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

   b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

   c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

   d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always data that can be merely

26

reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

59. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of Device A and B consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the devices to human inspection in order to determine whether it is evidence described by the warrant.

60. *Manner of execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## V.     CONCLUSION

61. Based on the above information, there is probable cause to believe that Simone DOWNER violated Title 18, United State Code, Section, 922(g) (felon in possession of a firearm and user in possession of a firearm), and Title 21, United States

Code, Sections 841(a)(1) (knowingly and intentionally possessing with the intent to deliver a controlled substance, heroin and cocaine) and 846 (conspiracy to distribute a controlled substance). There is also probable cause to search Device A and Device B, which is more particularly described in Attachment A, and which is currently located at the Milwaukee Police Department Property Control Division at 2620 W. Wisconsin Ave, Milwaukee, WI, for evidence of these crimes, as described in Attachment B.

# ATTACHMENT A

The property to be searched is:

1. One (1) Black Samsung flip style phone, Model SM-B311V, Serial no. A0000047714309, currently in Milwaukee Police Department custody under inventory number 18030878, item number 1 and is currently located at the Milwaukee Police Department's Property Control Division at 2620 W. Wisconsin Ave, Milwaukee, WI. (Device A)

2. One (1) grey LG brand smartphone, Model LM-X210MA, Serial no 802CYLH14088, currently in Milwaukee Police Department custody under inventory number 18030878, item number 2 and is currently located at the Milwaukee Police Department's Property Control Division at 2620 W. Wisconsin Ave, Milwaukee, WI. (Device B)

1

# ATTACHMENT B

1.      All records on the Devices described in Attachment A that relate to violations of Title 18, United States Code, Section 922(g) and Title 21, United States Code, Section 841(a)(1) and 846 including:

   a.   Electronic drug or money ledgers, drug distribution or customer lists and related identifying information, drug supplier lists (including names, addresses, phone numbers, or any other identifying information); firearm transactions; correspondence, notations, logs, receipts, journals, books, records, and other documents noting the price, quantity, and/or times when controlled substances were obtained, transferred, sold, distributed, and/or concealed lists of customers and related identifying information; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions; types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

   b.   Electronic telephone books, address books, telephone bills, photographs, letters, cables, telegrams, facsimiles, personal notes, e-mails, documents, and other items or lists reflecting names, addresses, telephone numbers, addresses, and any communications regarding illegal activities among and between members and associates involved in drug trafficking activities;

   c.   Records, items and documents stored on the Devices reflecting travel for the purpose of participating in drug or firearm trafficking activities, such as passports, airline tickets, bus tickets, vehicle rental receipts, credit card receipts, taxi cab receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls reflecting travel from August 2012 to the present;

   d.   Bank account records, loan documents, wire transfer records, money order receipts, postal express mail envelopes, UPS, FedEx, and other mail service receipts and records, bank statements, checks, credit card records, safe deposit box records, records and receipts and rental agreements for storage facilities, financial records and notes showing payment, receipt,

2

concealment, transfer, or movement of money generated from the sale of controlled substances, or financial transactions related to the trafficking of controlled substances.

    e.   Photographs, videotapes or other depictions of assets, co-conspirators, controlled substances, firearms, or other activities related to drug trafficking or money laundering.

    f.   Records of Internet Protocol addresses used; records of Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user typed web addresses.

2.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

3.    As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

3